Mr. Peterson. Good morning, Your Honors. May it please the Court, Thomas Peterson on behalf of the Appellants Deere and NAVCOM and with me is my colleague, Mr. Kurt Oldenburg. So this California law contract case, and I'm going to endeavor to save three minutes for rebuttal. Okay. This California law contract case, I think, really divides into two parts which represent alternative grounds by which we ask the Court to reverse. The first is the district court's erroneous determination at summary judgment that the defendant, which I'll call Oki for these purposes, had a right to terminate the contract during the development phase. And this formed the basis. That's what the contract says, doesn't it? No, it doesn't, Your Honor. The contract's ambiguous about that. And the problem is — Well, counsel, could I just offer an easy way to harmonize Section 1.0 and Section 2.7 and ask why this isn't the right way to read the contract? Section 1.0 requires three months' notice for either party to end the contract at any time. Right?  During the development stage. Right. But 2.7, I may be getting — I'm getting them backwards. One of them says you can end this any time, but that the buyer has this extra option during the development phase immediately, and then there's some money to essentially compensate for the lack of notice. Why can't they live side by side? Well, they — And why isn't the district court correct? They can't, Your Honor. Perhaps if I could start, let me just clarify what the two sections do. So the first section is 1.0. That's the one Oki relies upon, and that speaks about the term of the contract and provides that it will renew unless there's three months' notice of termination given. And that's what the district court invoked. The other clause is 2.7, and the contract is divided into parts, and it has — contemplates phases. And this speaks to the development phase, which was the first phase of the project. And it says that during the development phase that only NAVCOM may terminate, and if it does, then it has to pay some of the development costs. Now in terms of — What does development mean in 1.0, then? The word development is simply a description. It's not limited, Your Honor, to the development phase. If you look at that term, what it says is the term of this agreement for purposes of development and purchase order placement. So it's talking about the totality of the contract governing both the relevant periods. But I want to get — I'm not sure if I've answered — It does cover the development phase. You just said it covers both relevant periods. But it talks about the term of the contract. Who drafted the contract? It's not — it's not clear that one party was the predominant drafter. So this was something that too — I assume your client is a sophisticated business entity. Nobody disputes the sophisticated nature of the business parties. So you don't get to the contra profferentum type of issue here. But so I'd like to get back to Judge Graber's question, I think the Court's concern, which is why can't these things be reconciled. Under California law, you've got to take a look at the available extrinsic evidence in order to determine whether there is ambiguity in the contract and whether or not it supports an interpretation of the contract to which it is reasonably construed. You've got two different provisions that are arguably speaking to the subject of the ability to terminate the agreement at different stages. You've got a contract which is prepared in phases. You have to put yourself in the position of the parties at the time they entered into the contract. The contract contemplates that this development phase was supposed to be completed within 10 months. So that would have been before you ever got to the possibility of terminating under Section 1.0, particularly because under this contract, the way Oki was going to make money was by saying it would have had no incentive to terminate this if it had developed a product successfully. The next thing you have to look at is what was the object of the contract. The district court here didn't appreciate the fact that the object of this contract was a commitment to actually develop these products. If you look at Section 2.6 of this agreement, it says that the engineering protypes, quote, will be delivered. In Section 2.8, it says that these shall conform to the product specifications. This wasn't just a what I'll call best efforts undertaking on the part of Oki to see if it could manage to accomplish something here, as the district court mistakenly concluded. This was a promise to deliver products. And why is that relevant for purposes of the choice between 1.0, excuse me, and 2.7? It's relevant because it doesn't make any sense to suggest that the buyer who had a promise for delivery of these prototypes would have agreed to a contract which allowed the seller to walk away without consequence. Now, they can efficiently breach, which is what this lawsuit is about, that they should be held to their decision not to go forward because they efficiently breached, having concluded they couldn't deliver those products. But that doesn't allow them to walk away from the commitment with impunity. When Oki sought to determine to terminate, did they rely on Section 1.0? No, Your Honor, they didn't. And that brings us to the extrinsic evidence in this clearly contrary to California law. If you look at page 15 of the extract. What did they rely upon? The district, they simply said that they were terminating the agreement. Their notice letter in July of 2008 simply says the agreement is being terminated. They do not invoke any part of the contract as the relevant basis for doing that. And is it your client's position that the moment they did that, they had no right to do that? Correct, that they breached. Because why did your client wait four years to complain? Your Honor, my client was left in a situation where we were scrambling around to try to come up with something that we could use to put this machinery into operation. And we acted within the statute of limitations. Weren't you already doing that? You just, you didn't start scrambling around at the time of termination. You had some discrete project going on on the side, didn't you? What we did was we were faced with a situation where they delivered two prototypes to us at different times, which didn't work. There's no dispute about that. And so what we started to do, as any responsible contracting party would do, is you started to look into how you were going to mitigate the damage you were going to suffer from the failure of performance. And that's what we were doing. And so then there's, in 2008, there's the breach, the repudiation of the agreement. Then it's about a year before we're managed to get the equipment up and running. And then there's, you know, trying to assess what to do on a going forward basis. And yes, we waited a little time to file the lawsuit, but within the relevant statute of limitations, Your Honor. So I don't think that's a factor that, you know, has any particular significance in this case. And then let me just- Counsel? Yes, Your Honor. Oh, I'm sorry. When you're finished with your answer, I have another question. But please finish your answer. I just wanted to go back to the extrinsic evidence, because there's another piece of it, if I may. And unless, but Your Honor, obviously I'm here for you. Well, it may bear on this, because what effect, if any, are we to give to the jury verdict form, the answer to question number three, in which the jury found that you did not prove a contractual obligation to develop the proposed chip? Your Honor- How does that bear on our analysis? It doesn't. What are the facts? It doesn't, Your Honor, because, so what happened here was, there's no question there was the written contract, the one that they gave notice they were terminating, which was the so-called 19 3-chip contract. There was a written amendment contract, the number 25 3-chip contract. What Your Honor, Judge Graber, what you're referring to was some discussions, which never culminated in any amendment to the agreement, with an idea toward trying to solve Okie's inability to produce anything that worked by way of a 4-chip contract. And so all the jury decided is that that contract was essentially never formed. But it doesn't undermine the fact that the other contracts were in existence. And while there were certain novation, abandonment, waiver defenses, the jury never reached those, so you can't explain the verdict on that basis. Let me just come back and round out the extrinsic evidence, which, if I may, because, Judge did not invoke Section 1.0. The other is an e-mail that was sent by Mr. Balabuena of Okie to the head engineer. This occurred back in February, I'm sorry, on May 31 of 2008, which was approximately a few months before the July cancellation notice, and in it he advised, and he's the man who's been dealing with NAVCOM throughout this project, and in it he tells Okie management, quote, the agreement has no option for Okie to cancel, and it is unclear what kind of penalty fee there would be for dropping out of the project. That's at ER 755. So under California law, you have to look at that extrinsic evidence, and you have to say to yourself, does it support a reasonable interpretation of this agreement? And if you then go back to these two provisions, you look at the way the contract was structured, you look at the fact it had a development period that was clearly contemplated to have been completed in ten months, and all the circumstances that would suggest that a buyer would be the only one who could be allowed to step away from a contract which is guaranteeing it delivery of its goods, it's a reasonable interpretation of the contract, and it leads to one of two consequences in terms of outcome. Possible outcome number one is, under California law, if the extrinsic evidence is undisputed, it becomes a question of law that this court could determine and direct the district court that the contract did not permit termination. Alternative number two is, if you think the evidence is capable of differing ways of looking at the agreement, then under California law, it clearly presents a jury question, and the and it had huge consequences in this case, because it changed the whole complexion of it. The complexion of this case should have been about NAVCOM's efforts to find essentially replacement merchandise and the damages that flowed from that, and the district court turned it into a case which was at best about whether there was any consequence to the failure to give the three-month notice and the decision to immediately stop work. And that takes me to the second alternative basis for you to hold, which is, if you disagree with what I've urged you with respect to the termination, it is that the jury had no basis on which to find that there was any — that OKI did not breach Section 1.0 of the agreement, which required that it give notice and it continue to work. It's clear that they saved themselves $1.4 million by doing that, and that's the kind of a consequence which would be a harm that would be the basis for a cause of action in this case. And so there's no dispute that they didn't perform the agreement, or rather give the notice. There's no dispute they stopped work, and this just degenerates into people's efforts to give other explanations for what the jury might have done, principally on the basis that somehow there was no harm. And again, plainly we would have had a right to restitution of the money we paid that did us no good. And also under California law, we would have a right to nominal damages for the breach of the notice provision based upon, in particular, the Sweet case. And I see that I've already eaten into some of my rebuttal time, so perhaps I'd better save the rest. Let me ask you one quick question, and we'll not detract from your rebuttal time. Under, I'm looking at the contract, under 1.0, can you tell the Court what the phrase prior to the expiration of any then current term, what does that mean? So the contract had an initial term which would run until, as you see there earlier in 1.0, until December 31, 2006. And then it renews. Then it automatically renews. So what the then expiration of any then current term means, I believe, until the end of that year. In other words, either 2006, which because they thought it would be developed, I don't think that was realistically expected, that would be the term, but it would be the end of whatever that annual renewal would be, Your Honor, I think. Thank you. All right. Thank you. And we'll put two minutes on the clock when you come back up. I appreciate that.  Mr. Lavgold? Good morning, Your Honors. My name is Mark Lavgold, with me is my partner, Patrick Heffner, and my colleague, Andrew Russell. May it please the Court, I'd like to start first with the 1.0, Section 1.0, the term. The Court has already hit on what we believe are the most salient aspects of this, and that is the plain language. As California law governs, the plain language should be what's guiding the interpretation. The term of this agreement, for purposes of ASIC, and then the parenthetical, development and purchase order placement, on its face it expressly says that it covers development and the purchase order placement, which is the second, those are the two phases we're going to talk about. So your position is that 1.0 says, although the contract continues until December 31, 06, it renews each year, and within one of those renewal periods, either the buyer or the seller could terminate on three months' notice? Not only during any of the, it could happen during the first period. Sure. There's nothing that limits it, because it says during any then-current term. It doesn't exclude the first term. So with that caveat, absolutely, as long as there's three months' notice that are given. And it expressly says that the buyer or the seller terminates. So we have both phases, both parties, any term. We believe that is the guiding principle with regard to Section 1.0, and the district court had no problems understanding that. With regard to the 2.7, we agree with the comments that were, the questions that came about, and our position is what the district court says, is that they're not inconsistent. The buyer has been given an extra benefit. During that period, they can terminate without notice, and that's not inconsistent. It just further gives them the additional benefit. But what it doesn't say is what the appellants, the plaintiffs in this case, wanted to say is that it somehow excludes any termination by the seller, in this case, Okie. There's nothing in there. Is there, excuse me, is there any dispute remaining between the parties that if the three-month notice provision of 1.0 applies, that the notice was insufficient? The, no, the page 32 of the reply brief, the parties, the appellants have said that the July 8, 2008, was a compliant notice. The question is whether or not the three months were given. With regard to that specific point, briefly, the way it's described in the briefing is that Okie then immediately threw up its hands, did nothing further, and refused to do any more work. But if you look at the actual language of the letter, and that comes up in the record ER 331, this is a July 8, 2008, letter, the last paragraph, Okie hereby provides notice of termination of the agreement as amended, and would like to discuss the terms for such termination with you at your earliest convenience. So this was not a situation where they said, we quit, we're done, we're out of here. Now it's not surprising that NAVCOM and Deere did not have anything to talk about.  Absolutely. And it's clearly more than three months before the end of the then-current term. But we have a situation where there can be no question. The jury found, with regard to the question of Did they try to negotiate? No. There was nothing, honestly, as the record shows, there was nothing to negotiate. The parties had been discussing this four-chip option. There was no agreement reached on the four-chip option, undisputed. There was undisputed that it would require an amendment of the agreement to cover the four-chip option. So with regard to question three of the verdict form, I don't think there can be any dispute. Substantial evidence supports that. When you come back to question two is whether or not Now, they also argue that you, your client got a lot of money for not performing under the contract. You never delivered, your client never delivered a prototype that actually worked. What's your response to that? Our response to that is if you take a look at, first, schedule B. Schedule B plays in very important, and this is on page ER 107 of the record. The first thing on the buyer's responsibility is they're required to deliver the specifications. So if we don't have a specification to make, that's not a problem of my client. That's something that they have to fulfill. With regard to the last three steps in there, it says one is delivery of engineering prototypes. That's my client's responsibility, delivery. Their responsibility is then to evaluate the prototype and provide written approval if such a written approval is forthcoming. Now when we look at schedule C, this is the payments. The payments on the first payment is the upfront payment of a non-refundable $300,000. It doesn't say what that's for. It says it's not refundable under any terms. I'll come back to that in one moment. The second payment specifically says what has to be accomplished. The $120,000 due and payable upon delivery of block specifications, pin assignment and simulation results in conformance with, and it proceeds. That is a pure milestone payment. That payment was due, that was made when they received delivery of those devices, those in some cases. With regard to the first payment, they say that that's not a payment for cause, but all the work, this isn't one of those cases where they received the $300,000 and said, we're sorry, we're not going to do anything, it's not refundable. They were clearly working because they met the second milestone. So there's no... Wasn't there a third payment? The third payment is for, and that's where we get to relating back to what I was saying, $150,000 due and payable upon delivery of engineering prototypes. That's why I called attention to Schedule B because this lets us know what the delivery is. It comes before the two steps that have to be performed by the statement of work for the buyer, evaluation and written approval. If you look at 2.4 of the agreement, we have engineering prototypes shall be deemed acceptable if at the time of delivery, so we have delivery, after inspection and testing, they conform with the product specifications. That clearly sets forth, again, the three delineations, delivery and Schedule C says that payment is due on delivery. They want this to say that we had agreed, that Oki had agreed to deliver a working prototype, but not only did they deliver that, agree to deliver that, absolutely, it was supposed to be within 10 months. This 10-month argument is a very dangerous ground which appellate counsel has stepped into, more so in the reply brief, because if that breach was a breach, the failure to deliver, comply with the 10-month requirement, then that breach occurred back in 2006 and this entire case would have been barred under the statute of limitations. The district court warned about that when it said in the granting of the summary judgment, you can raise your other grounds under 2.2, 2.4, 2.6, 2.8, but be very careful, you don't run afoul of the statute of limitations. If they want to have the position that it was absolutely due and payable, it was due and deliverable in a working prototype back in 2006, then that's perfectly fine because then they've exhausted their statute of limitations by a long shot. That's not the position that was before the court. The position before the court was there was no breach until it occurred in 2008, July 8, 2008. Now there also can be no dispute as to what happened before that. We have a situation where the jury has heard the evidence and we have a situation of Mr. Galleon, Dr. Galleon, he's the senior researcher on the other side, the engineer. He's the person who's opposite is Mr. Balbuena, who we talked about. He's the primary contact for the case and he testified in cross-examination, well, at least as of that time, it's agreed that version 25 design will not be made, correct? Answer, yeah. The version 25 spec has three chips and there are pinouts in it. If we're proceeding to a four-chip solution, the specification has to change, but the key point is, and there's a repeated recitation where we show, there was agreement starting in February 21st, 2008, and through the spring, version 25 is gone. The decision has been made to go with a four-chip design. The four-chip design is not version 25. Version 25 is the one that they decided not to make. So if we assume for one moment the record is what the record is and there's nothing to dispute that, when it comes around to July 8th, 2008, when we have a situation where the four-chip design, we haven't been provided with a specification that would be required under Schedule B to be delivered by the buyer, it's going to cost a lot more money and at this point, they've paid $470,000, the first two payments, and $420,000. My client, they admit freely in the record, has invested well over $1.6 million and if we're going to go forward with this new risky design, it's going to take more money. No agreement gets reached. So that leaves us with, what exactly was my client supposed to do during those three months, even if they didn't respond to the request to discuss the terms of termination? Were they really supposed to get in the lab and continue to make a version 25, which they expressly said, it's not what they want, they're not going to buy it, it's not what they need? And everybody agrees, it's not going to do what anybody wants. That's the situation we're left with. And so when it comes around for whether the jury sits there and has a substantial basis to find that there's no breach, absolutely. What exactly were they supposed to do during those three months and the jury could conclude that. And that's before we get to the issues of harm. The statute in California, the law of California, has four elements. There has to be standard elements of contract and there has to be, you have to have a formation. The asserting party has to have fulfilled all of its obligations or been excused. The district court found that their failure to pay the 120 upon delivery of the chips, the prototypes, could have been a basis that the jury could have decided. We don't know. They don't get to those issues. But also we get to the point is what could be the harm? Because the fourth element of the jury instruction, which the plaintiffs provided based on the model jury instruction, based on the applicable law, says there has to be a harm to find a breach of contract. And in that regard, it's clear there was no harm. And this isn't the usual case where we could hypothetically say, well, maybe there was a harm but we can't really calculate it because it's kind of speculative. Or well, we're not sure what the harm is but they clearly showed that there was something that they didn't get and they were expecting and something like that. To the contrary, we have record citations where the CEO is saying things like, this is a benefit for us. And we have executives saying, this is great news. And we have another executive saying, this is going to be perfectly fine because we've already developed the parallel path. We've never had to scramble. They've never had to replace anything. They followed a parallel path because this was so risky. So they continued doing exactly what they had been doing for all the time before that. And as a trial, four years after that, they were still doing exactly the same thing, even though they'd already achieved another ASIC from another company. Okay. You don't have to use all your time. There's no further questions. I don't see any. Thank you very much. Thank you. We'll hear a rebuttal at this time. Two minutes on the clock. Counsel. Your Honor, the harm in this case was that Deere had to spend $12 to $13 million that it didn't expect it would have to spend in order to make something that would work. The promise in the contract, you can't get away from the fact that the contract contains a promise that these goods will be produced, 2.26, 2.28. This is not a we'll use our best efforts. Okie sold this on the basis they could do this. So for that reason, you have to look at Section 1 and Section 2.7 in the light of why would a contract allow someone who is promised to deliver goods to walk away in the middle having received payments without delivering on the promise? That's why you have to look at it in the light of the extrinsic evidence in Okie's own admissions that they had no ability to walk away from the agreement. To Judge Graber's question, they did terminate the agreement, but they didn't give the required notice. Now, my friend points to some language about how we'd be happy to talk to you about it. You don't terminate and then say, we'll talk to you about it. What you're supposed to do is say, we're going to end this agreement at the end of the current term. They also said that you all conceded in your reply brief at, I think, page 32 that the notice was compliant. Not compliant with Section 1.0, Your Honor. What we said is it effectively terminated the agreement and constituted the breach. The 10-month period, the relevance of that in this case is it helps you understand what was contemplated at the time the contract was signed. That is, that the development phase was going to be over before we ever got to the point of there being any issue about a renewal or non-renewal with respect to Section 1.0. With respect to the 4-CHIP solution, the jury decided that there was no agreement on a 4-CHIP solution, there was never an amended agreement which you would have had to implement it so the other contracts were in force, and I see my light is coming on, and I thank you very much. Thank you for your argument. Thank both sides for their arguments and excellent briefing. It's an interesting and difficult question, and we'll do our best to resolve it. So the case we've argued is submitted to decision, and the Court will stand in recess. Thank you. All rise.
judges: Thacker, Hawkins, Graber